| 2120 - Served | 2121 - Served | | |
|---|---|---|---|
| 2220 - Not Served | 2221 - Not Served | | |
| 2320 - Served By Mail | 2321 - Served By Mail | | |
| 2420 - Served By Publication | 2421 - Served By Publication | | |
| SUMMONS | ALIAS - SUMMONS | CCG | |

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, _____ DIVISION**

298

(Name all parties)

Hillarie P. Green

v.

Chicago Board of Education
125 S. Clark, Chicago, IL 60603
Clark

No. 2013L013297
CALENDAR/SSN Y
TIME 00:00
Retaliatory Discharge

**SUMMONS**

**To each Defendant:**

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☐ Richard J. Daley Center, 50 W. Washington, Room 801, Chicago, Illinois 60602

☐ District 2 - Skokie
5600 Old Orchard Rd.
Skokie, IL 60077

☐ District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

☐ District 4 - Maywood
1500 Maybrook Ave.
Maywood, IL 60153

☐ District 5 - Bridgeview
10220 S. 76th Ave.
Bridgeview, IL 60455

☐ District 6 - Markham
16501 S. Kedzie Pkwy.
Markham, IL 60426

☐ Child Support
28 North Clark St., Room 200
Chicago, Illinois 60602

You must file within 30 days after service of this Summons, not counting the day of service.
IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.

**To the officer:**

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

WITNESS, _____ NOV 20 2013

Atty. No.: _____
Name: Hillarie Green
Atty. for: _____
Address: 2318 East 71st
City/State/Zip: Chicago, IL 60649
Telephone: 773-318-2888

Clerk of Court

Date of service: _____,
(To be inserted by officer on copy left with defendant or other person)

Service by Facsimile Transmission will be accepted at: _____
(Area Code) (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

Hillarie Green 298

v

Chicago Public Schools

Wayne K. Issa

Retaliatory Discharge

## Parties

1. Plaintiff Hillarie Green ("Green"), Pro Se, brings this action against the Board of Education of the City of Chicago, d/b/a Chicago Public Schools (the "Board"), Wayne K. Issa ("Issa"), Aubrey Monks ("Monks"), Stephanie Dollinger ("Dollinger") Inspector General Board of Education, John Doe, any unknowns, and (collectively "Defendants"), and alleges the following:

## Nature Of Action

2. Claims asserted in this Complaint arise out of Defendants' actions and/or omissions that were intentional, willful and wanton, malicious and/or in reckless disregard for Green's rights as secured by 42 U.S.C. § 1981 and 42 U.S.C. § 1983, as amended by the Civil Rights of 1992, in violation of the United States Constitution as applicable to the states by the First and Fourteenth Amendments. Additional claims arise under 42 U.S.C. § 1985(3), 42 U.S.C. § 1986, and Illinois state statutory and common law.

3. CPS through long-standing practice, policies and procedure afforded Issa (an interim principal), unattended direction, in the decision making process involving personal at ABEA including discipline, evaluation, hiring and firing of teachers and staff.

## Plaintiff

4. Green, a black female, resides in Judicial District

## Defendants

5. Pursuant to Illinois School Code section 34 et seq., CPS provides oversight to the educational process for students who attend public school through Metropolitan Chicago. CPS is organized, operated and funded pursuant to state and federal law. CPS operates from several locations including its Corporate Headquarters, located at 125 South Clark Street, Chicago, Illinois, 60603. CPS operates ABEA High School, Located at 241 N. Pine Ave, Chicago Illinois.

6. This complaints includes Mr. Wayne K. Issa in his individual and official capacities as Principal of ABEA High School

## Facts

7. Green was a hired by the Chicago Public School (CPS) in August of 2003. Hillarie P. Green works as an English teacher for CPS for 9 years. Hillarie P. Green excellent and superior evaluations.
8. At her own expense Green attained a Master's degree in Educational Administration in 2009[1].
9. Through her own efforts Green attained National Board Certification in 2008[2]
10. Green received mentoring from her principal Nancy J. Apke[3]
11. Green requested an administrative transfer from John Hancock High School (Hancock) where she received and Excellent rating in 2011.
12. Green taught AP Literature and Composition at Hancock.
13. Green worked for 5 years in the capacity of English department chairperson under two separate administrations
14. In the capacity of English department chairperson Green was responsible for facilitating department meetings, gathering data, demonstrating instructional strategies, and implementing administrative directives with in the English department
15. In many cases, under the leadership of Green, the English department was held as an exemplar for other department chairpersons
16. Green shared the success of the English department at a professional development to assist other departments of personal and professional relationships that facilitated the English departments success
17. Green resigned as English department chairperson in 2010 because of a new addition to her family.
18. Green was concerned that she may not be able to meet the many requirements of department chairperson with a small child at home.
19. Green returned to Hancock in May of 2011 in good standing with the administration and staff.
20. Green remained active in helping in cross-curricular development[4]
21. In 2011 Green was hired as an English teacher at Austin Business and Entrepreneurship Academy (ABEA).
22. Green was the only tenured black teacher on staff.
23. On the first day of school, a professional development day, Issa created a secure setting in which every staff member felt welcomed and willing to take on the struggles of the at risk students at ABEA.
24. During a lunch break, Issa walking into the meeting room and announced, "Y'all want Terry (Thompson) to be y'all union delegate[5].
25. Most of the teachers did not respond.
26. After speaking to Thompson, Thompson noted he had be school union delegate at his previous school for 3 years.
27. On the first day of school, Issa stated to Green that he was having trouble deciding whom to assign the department chair position.

---

[1] Degree required for consideration for principalship and other leadership positions
[2] National Standards for Teaching Excellence in core subject- Adolescent-Young Adult Language Arts
[3] Nancy J. Apke was paramount in constructing the writing curriculum for CPS
[4] Assisting math, science and history teachers in the instruction of writing to learn and learning to write.
[5] The union delegate is responsible for addressing issues with violations of the contract and well as teacher/principal relationships.

28. Green deferred to his better judgment, wanting to work with the administration to create a strong team.
29. During the year, the principal, Issa (black) made clear his preference for white teachers and staff members. The harassment and retaliation of Green were an ongoing issue throughout the 2011-2012 school year.
30. Green had 5 years previous experience as department chairperson, Educational Administration Degree, and National Board Certification of Professional Teaching Standards (Masters Teaching Certification).
31. Monks was chosen to be English department chairperson. Monks had no advanced degrees or training to hold this position.
32. Despite the large number of black teachers with advanced education, training and degrees in every content area, all department chairpersons were white.
33. The Special Education department chairperson (Rosenberg) was a second year teacher working in his first year with in CPS.
34. Monks was a non-tenured[6] teacher with no previous leadership experience. Throughout the year this became clearer. Monks would not produce a clear agenda for meetings. Monks did not have specific implantation strategies for any directives coming from administration. Monks did not produce an action plan for the English department to meet its goals.
35. Mr. Issa regularly disregarded the professional and educational abilities and concerns of black teachers and gave leadership positions to novice white teachers.
36. In preparing for the first day of attendance for students, Green noted there was not curriculum for Junior English (British Literature) and asked Monks if there was an outline in place for the junior students.
37. Monks laughed and showed Green a copy set labeled for sixth grade and told Green this is what she would be using for the sophomore class.
38. Monks went on to state, "Whatever you teach, they're not going to get it. They don't read and they don't care."
39. Monks continued, "Don't give them homework out of the books. You'll never see the books again."
40. Green was concerned about this approach; therefore, Green created a curriculum using the English III materials and selected novels she believed would interest as well a challenge the students.
41. During the first week of school, the students were very unruly; during meetings the teachers discussed the fact that none of the staff or administration was prepared for the behavior of the students.
42. Issa noted to Green that this was to be expected from "these kinds of students."
43. On several occasions early in the year, Issa enter Green's classroom and was pleased by what he saw
44. As the year continued, Green consistently discusses successes and struggles with Issa.
45. During one lesson, Green was creating academic and behavioral norms for the classroom.
46. Green was maintaining an effective classroom which Issa often copied in practice and pedagogy.
47. Later, Issa used this same practice in a staff professional development.
48. After a practically difficult class in early September 2011, Issa entered the room of Green. Issa asked her how she was doing.
49. Green explained the students called her a b*tch" in the classroom and telling Green she was not a "real" teacher.

---

[6] She was unable to maintain employment at any school for more than 3 consecutive years.

50. Green informed Issa that the students had been very difficult that day, but she wanted to stick it out and try new strategies for the students' success.
51. Issa said that one of the students stated I had called her out of her name.
52. Green vehemently denied the allegation.
53. In eight years of employment with CPS Green has never been accused or reprimanded to disrespectful behavior toward students.
54. At the time Issa stated, "Don't worry, they are always pulling stuff like this. Kids lie when they get in trouble."
55. Looking for professional feedback and guidance, Green approached her department chairperson, Monks, about the behavior of the students. She noted that she, "just throws them out."
56. There was not disciplinary plan of action for the student behavioral issues or infractions throughout the school. The teachers' consensus was to put students out of the classroom.
57. Green tried to avoid this practice whenever possible.
58. Green never had a fight in her classroom. She created in the classroom greatest possible level of calm in the situation.
59. A large majority of the students enrolled at ABEA are special needs students[7].
60. As the school year progressed, Green noted there were not IEP's (Individual Learning Plans for special needs students) in any of the classrooms for special needs students. This is a direct violation of federal and state law.
61. Green continuously asked Rosenberg about the IEP's for students enrolled in her classroom.
62. Rosenberg noted that all the IEP's from the year before were destroyed or lost and they did not have enough staff to create the IEP's.
63. In one class Green had eight (of 24 total) students with IEP's. State law requires teachers to have a special education teacher in any classroom where 30% of the students have special needs.
64. There was no cooperating team teacher (CTT)[8] attending Green's fourth period class.
65. Green addressed this issue with Issa. His response was, "we have to work with what we got."
66. Green addressed this illegal practice with Thompson (the schools union delegate).
67. Green took this action because none of the requirements were being met for student IEPs. Thompson shared teachers' concerns with Issa but did not follow up with the union to resolve the issues. Thompson did not act in the best interest of the teachers. Rather, Thompson simply kept Issa informed about who complained and what they complained about.
68. Thompson did not contact the Chicago Teacher's Union (CTU) about Green concern.
69. Thompson reported this to Issa and said was seeking to file a grievance.
70. This began a yearlong harassment of Green the culminated in an E-3 process[9] and her eventual termination.
71. This assertion from Thompson was not true.
72. Green has no record of grievance action in the past.

---

[7] Special needs can include behavioral modifications or instructional modifications
[8] Cooperating Classroom Teachers are responsible for modifications of all lesson plans and assisting in the daily instruction of the class.
[9] Remediation process for unsatisfactory tenured teachers.

73. Green was seeking ethical and educational justice for the students enrolled in her classroom.
74. This exchange began a practice of harassment that continued to increase until Green was humiliated and terminated.
75. In early October, Issa stated the school would be participating in an peer review session.[10]
76. On October 18, Issa(Principal), Monks(English department chairperson), Mr. Sanchez(Science), Mr. Nicholas(Business) entered the classroom of Green.
77. During this lesson, Green was teaching the proper outlined structure of a paragraph.
78. Green noticed that one students head was down. Green called on this students and she responded to the questions and set up in her seat.
79. Later in the day Green asked one of the teachers, "Want did you think. Did you understand everything that was going on?"
80. His response was a very standoffish, "Hey we just did what we were told to do."
81. October 19, 2011 Issa called Green to his office to discuss what he called a "peer review debrief".
82. In the "peer review debrief", Mr. Issa noted that all the colors on the board appeared to be the same.
83. At that time Green told him she was using the markers he had from last year. She had requested markers from Monks, but was told there were no funds available.
84. Green stated, "I could not get any supplies and in most cases had to spend my own money for basic classroom materials."
85. Green had no overhead projector in the classroom: a common part of all classrooms to clearly display lessons examples and exemplars.
86. Monks' class room was equipped with and ELMO[11]
87. Green did not have access to the Smartboard in her classroom because there was no computer to connect the board. There was not training provided for use of the Smartboard
88. Issa state that the lesson did not seem to align to English CRS[12]
89. Green explained to Issa at the time the lesson was reading and writing focused. The students read a piece of literature and were asked to construct a paragraph discussing the main idea.
90. English classrooms are accountable for reading, writing and the English portion on the ACT.
91. Green stated that she believed Issa's presence (as an administrator) compromised the dynamic of the experience and that it was contrary to best practices. This compromised the experience for Mr. Nicholas.
92. The absence of the administration is a key component of peer review, an initiative that seeks to improve the instructional practices of teaching.
93. The goal of the peer review is to have an environment where there is a free exchange of ideas and best practices through shared observations.

---

[10] Teachers are allowed to enter the classrooms of their peers and look was to improve both instructor level of effectiveness.
[11] Electronic Visual Evidence Presenter (projector used in classroom and professional development presentations)
[12] College Readiness Standards outline college readiness by the ACT. These standards are produced for Reading, Writing, English, Science and Math

94. The peer review in this instance was used to create division and derision in the staff. The observation also setup undue tension between teachers. As noted in the reaction of Mr. Nicholas to the simple question, "Did you understand everything that was going on?"
95. The peer observation is something that is not part of a formal evaluating process. In order to insure this, administration does not participate in the observations.
96. Green noted this to Issa in an informal debrief after the "peer" observation.
97. Issa stated, "I understand your expertise and experience in the past, but we are looking to go in a different direction at ABEA."
98. After the reaction she received from Mr. Nicholas, Green informed Mr. Issa that she was also concerned that information collected from the peer review was going to be collected and used by you in your formal evaluation procedure.
99. Issa told Ms. Green that she, "Just wants to fight administration and complain."
100. Issa made clear the past complaints about the lack of IEP's in the classrooms and illegalities of that practice lingered in his mind.
101. The implication of this statement is that Green's concerns for students were not valid to you and had no legitimacy.
102. Green told Issa at the time the information and materials received in the English department meetings did not give teachers in the department opportunities for growth and did not relate clearly the expectations of the administration.
103. Green said, "It is like I am being set up for failure."
104. Green made it clear to Issa that she does not challenge administration as a rule. Green stated that she had never filed a grievance before and didn't want to file a grievance at that time.
105. Issa responded by saying, "I find it hard to believe you've never filed a grievance."
106. The actions in this "peer review debrief" were overt acts of harassment in order to make Green be quiet and accept the student conditions and the illegalities of those conditions.
107. Green shared her concerns from this exchange with Ms. Jenne Hook, ABEA librarian.
108. Hooks shared with her at the time that Issa often humiliated her in front of other staff members.
109. Hooks recalled to Green that Issa asked her in an open meeting, "What do I pay your for again/"
110. Hooks noted that she was leaving CPS for a different job because Issa was making it very difficult for her to develop a library for ABEA.
111. Ms. Hooks informed Green that she would be leaving. She advised Green to make recordings of her class and participate in an active peer review of teaching practices. "That way when Issa tries to give you and unsatisfactory you will have evidence you were doing your job."
112. When a Case Manager was hired, C. Nunn (black) she was assigned to work to develop IEP's for the students. Nunn had 18 years of experience in working with at risk students
113. Two weeks later Stephanie Dollinger (white) a second year teacher was hired and replace Nunn as Case Manager

114. Dollinger was also assigned to be the CTT in my fourth period classroom.
115. Dollinger never met with me for planning.
116. Dollinger rarely attended class, and when she was there her lack of familiarity with the material left her ileuquipted to work with the students.
117. Dollinger spent most of her time in the classroom standing in the corner.
118. Students would often ask Green, "Ms. Green who is that lady/"
119. Green explained on more than one occasion to the students that Dollinger was the second teacher assigned to the classroom.
120. Very soon upon her arrival, she stopped attending Green's fourth period class.
121. Dollinger disregarded classes she was assigned to with Green.
122. In her sixth period class, Green had a student that required a special education teacher/assistant because of her severe deficits.
123. Dollinger was the teacher assigned to attend class with this student.
124. Dollinger never attended class with this student.
125. On December 16, 2011 Mr. Issa issued a cautionary notice for late arrivals including minutes that were not approved under the union process.
126. Green was nearly always present at the school 20-25 minutes before the first bell and remained for 40-60 minutes after the last bell prepping for the following day
127. Issa used this disciplinary action to begin a paper trail to insure the termination of Green
128. It is known to administrators that teachers and staff have no recourse for disciplinary action taken by the administration.
129. This cautionary notice was without merit because it did not meet the parameter of the contract. The school day included and non-union approved start time- labeled "O" period.
130. This is the first disciplinary action Green has ever had added to her personnel file.
131. Green contacted the school's union delegate, Terry Thompson (Thompson) about the minutes that were owed in a regular school day.
132. Thompson falsely claimed that he contacted the Area Delegate at CTU (Joseph McDermott).
133. Thompson also said he would find out the exact time teachers needed to be in the building.
134. Thompson continued to claim that he was in contact with delegates at CTU.
135. Green notes being reprimanded for missing unsanctioned minutes. Thompson did not call the CTU, rather, Thompson told Issa that Green was complaining about the school schedule and wanted to file a grievance
136. Green and two other black teacher discussed filing a grievance with Thompson.
137. Martin Palamor (black) and Sheketta Hall (black) told Thompson they were having minutes taken away from their lunch period.
138. Palamore and Hall were both harassed for the remainder of the year.
139. On February 6, 2012, the staff received an email with an attachment stating that Ms. Monks (white) would be made the Dean of Instruction. At the time of this appointment, Monks still did not hold any additional training or administrative degrees.
140. The email stated that the staff should follow Monks directions as if they were from Issa himself.

141. This is a violation of the union contract.
142. Green was informed by P. Oliver (a special education teacher) to be careful because Monks was giving negative information about me to Issa. She noted that the negative information was very serious and may cause trouble for Green
143. In February, Green was assigned an additional class.
144. Green received a group of Sophomores from Monks seventh period class.
145. One of the female students stated several times that they were sent to Green because Monks "couldn't stand them."
146. She also stated that Monks chose the keep the good students that she liked.
147. Green received a male special education student from Ms. Monks' seventh period class.
148. The male student made very strange comments, and often threated other students in the class.
149. The male student would talk about the private parts of females' students.
150. Green kept anecdotal notes on the student's behavior and shared these notes with his special education provider.
151. Green told both the special education provider[13] Rosenberg and Issa she was afraid of the student.
152. Rosenberg noted that the student had a few self-contained classes because he did not function well with other students.
153. After speaking several times with, Mr. Rosenberg, the student's special education provider Green requested that he be moved to a self-contained classroom for English.
154. Mr. Rosenberg sent copies of emails to Green and Issa
155. Issa made no attempt to resolve the issue Green was having.
156. On or about February 7, 2012 Green was injured by the male student.
157. After the assault Green was called down to the office go give a written description of the assault.
158. Green detailed in the assault and the strange behavior that led up to the incident.
159. The male student, who assaulted Green, was sexually harassing to a female student.
160. The student attempted to run after the female student.
161. Green was pushed into the wall and then pushed a second time into a row of desk.
162. When the female student was able to run out of the classroom, Green was able to stand between she and the male student yelling "Security!" "Please Stop Mr._____! Please!"
163. It took well over two minutes for security to arrive
164. This incident caused nerve damage in the right leg of Green.
165. When Green was assaulted on or around February 7, 2012 that Issa never filed an incident report with the district. This is a legal requirement.
166. During the school year, Hillarie Green's evaluations declined rapidly these changing requirements and Issa's harassment. This decline included statements about her in methods of instruction.
167. On February 14, 2012 Green, in an email, raised a concern to Chicago Teacher's Unions delegate Joseph McDermott about the unfair and illegal practices at ABEA.

---

[13] The special education teacher assigned to oversee the students case and progression

168. In this email, Green explained to McDermott, that she was having problems with Issa, and she also noted that there was a need to have a legal election for the school delegate.
169. Upon a visit to ABEA, within days of Green's email, McDermott noted that Thompson had never contacted him about any issues teachers and staff had discussed with him.
170. Palamore, Hall, Green and other teachers noted we needed to have an election to choose a new school delegate
171. Palamore was chosen as the new school delegate.
172. Days after these actions, February 9, 2012 Issa entered the classroom and gave Green a very negative evaluation.
173. On February 10th 2011 Mr. Issa complained in an unofficial debrief that Green was teaching writing in her English class.
174. Common Core Standards and College Readiness Standards make writing an instructional requirement for students' success on the ACT.
175. Mr. Issa stated that writing was not a component on the ACT and should not be taught in the classroom. Simply because the state stopped paying for the students to take the writing portion of the exam, that does not decrease the validity of teaching students through writing.
176. In the debrief of the evaluation, Green asked specifically for definitions on explanations in areas of weakness.
177. Issa responded, "I can't go into specifics about that right now."
178. Issa asked Green, "Why are you teaching writing? It is not on the ACT."
179. To this Green replied that the educational approach of ABEA should include writing across the curriculum, and if it did not ABEA was not a good fit for her.
180. Issa responded, "I am sorry you feel that way."
181. Green's teaching practices did not decline; rather Mr. Issa changed her observations in retaliation.
182. Immediately following debriefing, Green made a phone call to a former colleague and resent administrator at Harper High School. Mrs. Gayle Neely
183. The position at Harper was with the PASS [14] program.
184. Green sought this position out of frustration due to the ongoing harassment by Mr. Issa.
185. Green feared that Mr. Issa was attempting to hurt her ability to work in her profession
186. Neely worked with Green for eight years at Hancock. Neely held Green in very high regard.
187. Green requested to apply for the position Neely had open in her department.
188. Neely agreed.
189. Neely requested that Green make sure that she could secure an administrative transfer because she needed to fill the position immediately.
190. During Green's lunch period on the same day she asked Issa for an administrative transfer to allow her accept a position in another school.
191. Green told Mr. Issa she found another job. On that day, he agreed to give Green an administrative transfer.

---

[14] A program for students who are off track to graduate from high school to make up work and receive a diploma with their high school class.

192. Green called Neely back and set up and interview on or about February 24, 2012.
193. On February 22, 2012 Issa called Green to the office and issues her and Unsatisfactory rating.
194. Before the transfer could be requested by the other administrator, Green was placed in the E-3 process.
195. During the remediation planning Issa outlined a list of deficits Green needed to address.
196. Green questions Issa about each of these deficits as she watch Issa check them off on the list.
197. Issa could not provide details with example of any deficit and could not explain what an improvement of this deficit would look like in a classroom.
198. This included information from evaluators who were not legally, ethically and instructional equipped the give formal observations (Monks).
199. Neely still allowed Green to interview with staff at the PASS program.
200. Neely offered Green the position, noting that all Issa had to do was lift the unsatisfactory to allow Green to transfer.
201. When Green informed Issa that if he lifted the Unsatisfactory rating she could simply leave the school, Issa requested that Neely call him personally.
202. Neely called him within 20 minutes of Green and Issa's conversation.
203. Issa refused to lift the rating because, "it would look bad on me as a first year principal."
204. Neely called Green back to explain that Issa's intentions were extremely deleterious.
205. Neely warned Green to be careful with Issa.
206. Green called CTU and spoke to Maria Chavarria. Chavarria noted she would do everything she could to secure my transfer.
207. Chavarria, state that upon speaking to the person who grants the administrative transfers, Green would have been given an unsatisfactory anyway.
208. No attention given to the fact that Green was teacher with an Excellent rating entering the year.
209. No attention was given to the fact of Green's National Board Certification in Teaching Excellence.
210. CPS willfully supported Issa in his effort to harm Green's career.
211. Mr. Issa had no desire to see Green improve. He denied Green a transfer out of spite.
212. It was Issa's goal to humiliate Green in front of her peers as well as her students.
213. Students would come into Green's classroom saying, "That's why yo' a** getting fired." Or, "Ms. Green are your getting fired for real?"
214. The E3 process was used as a humiliation tactic.
215. During the evaluation process Green was continuously written up for unfair and unsubstantiated accusations.
216. On April 25, 2012 Green was written up for using the 'f' word in the classroom.
217. The students were swearing in the classroom, throwing paper on the floor and being very disruptive to the classroom.
218. After requesting the security remove the students from the classroom, the principal took no disciplinary action toward the students and did not question Green about the incident.
219. Mr. Issa coerced the students into writing the letter stating they heard Green swear and signing it.

220. Green immediately responded to all parents and students involved in the situation.
221. Green invited the principal to be involved in the meetings; he made no attempt to make himself available.
222. Green spoke to the parents of two of the students involved, one student, L.R said that she just signed the letter; she never heard me swear.
223. Mr. Issa would regularly swear in front of students.
224. Monk stated in an open meeting the problems she had with swearing in the classroom.
225. Monks made note of a swear jar used for her own swearing in the class room.
226. Green personally heard Ms. Monks berating and swearing at student.
227. Monks was never reprimanded for this language.
228. During the first 30 days of the remediation, Hillarie Green addressed and recorded every weakness identified by Mr. Issa.
229. Hillarie Green entered into the process with a good faith effort to comply with all of Issa's requests. Mr. Issa witnessed this compliance and excellence during your 30 day review of Green's work.
230. Issa then changed course and identified entirely new areas of improvement and weakness for Hillarie Green to address.
231. After 30 school days in the process, Green produced a portfolio of evidence that she fulfilled each deficit outlined in the unsatisfactory evaluation.
232. Issa did not look at the information, but called the portfolio, "An exercise in paper scuffling."
233. Issa continued to outline issues that did not directly address Green's instruction- jackets in class, students with cell phones, students out of uniform- all school-wide and district-wide issues.
234. The school as a whole did not have a sustained practice for dealing with these infractions. Students would be sent back to class still in jackets with notes from the dean or principal.
235. Monks often gave her students copies of District assessments to practice as "warm-ups" in the classroom.
236. During the department meeting, Monks stated she would, "make sure we could get a copy of the test before the test date."
237. Green explained to Ms. Monks, in the presence of another English teacher that this was an unethical practice. Green made clear that the standards should guide the lessons, not the questions on the test.
238. Green and Sheketta Hall listened as a student detailed the practice of Monks sharing answers to the district test before implementation.
239. Green called to report this practice to the Inspector General. Three days following this exchange (March 2012), Green was called down the Mr. Issa's office.
240. Green was called into the office with Mr. Issa and written up of a second time for a previous infraction (December 2011) for which she had already received a cautionary notice.
241. On or about March 15, 2012 Green requested union representation at a meeting which she had reasonable cause to believe would result in discipline[15]

---

[15] These items were ruled founded by State of Illinois Educational Labor Relations Board finding of fact in complaint filed on August 27, 2012 and Decided on November 14th, 2013

242. Green noted that she did not what to sign the paper- her legal right.
243. She also noted that she did not feel comfortable being in the room with Issa without a delegate present. Issa told Hillarie Green to "get out" without giving her a copy of the infraction-her legal right. Issa stated, "Get it from your union delegate."

$300,000

Hillarie Green
*[signature]*
2318 East 96th Street
Chicago, Il. 60617